# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF RHODE ISLAND

ROGERIO S. TAVARES,         :
       Plaintiff,         :
                         :
     v.                  :     C.A. No. 13-521S
                         :
ENTERPRISE RENT-A-CAR COMPANY :
OF RHODE ISLAND,         :
        Defendant.       :

## REPORT AND RECOMMENDATION

Patricia A. Sullivan, United States Magistrate Judge

      Pending before the Court are two motions challenging the viability of the *pro se*[1] Amended Complaint[2] of Plaintiff Rogerio S. Tavares ("Tavares") charging his former employer Defendant Enterprise Rent-A-Car Company of Rhode Island ("Enterprise") with sexual harassment and discrimination based on his national origin (Cape Verde), religion (Islam) and mental disability (depression and psychosis) and with retaliation for his complaints of harassment and discrimination.  First, Enterprise has moved for summary judgment, arguing that there is no genuine issue as to any material fact and that it is entitled to judgment as a matter of law.  ECF No. 117.  Second, Enterprise seeks the sanction of dismissal, arguing that Tavares fraudulently altered a material document and failed timely to produce certain documents.  ECF No. 119.  Both motions have been referred to me for report and recommendation.

---

[1] Tavares's *pro se* status was extensively addressed in this Court's decision imposing sanctions on him, *inter alia*, because he made filings that had been written by an attorney, yet represented that he had written them himself.  ECF No. 79; Text Order of Sept. 14, 2015.  Despite that history, in connection with these motions, I have applied to his filings the usual leniency that is appropriate for a *pro se* litigant.  See Hughes v. Rowe, 449 U.S. 5, 9 (1980); Haines v. Kerner, 404 U.S. 519, 520-21 (1972) (per curiam); Instituto de Educacion Universal Corp. v. U.S. Dep't of Educ., 209 F.3d 18, 23 (1st Cir. 2000).

[2] The operative complaint is the "Amended Complaint Pursuant to 28 USC § 1915(e)(2)," filed on July 25, 2013.  ECF No. 4 (hereinafter, the "Complaint").  In December 10, 2013, Tavares attempted to amend by filing a new pleading that was different from the version attached to an uncontested motion to amend; the pleading was stricken.  Text Order of Jan. 14, 2014.  Tavares made two more motions to amend on January 15, 2014, and April 1, 2014; both were denied.  Text Order of Mar. 17, 2014; ECF No. 47.

For the reasons that follow, I recommend that Enterprise's motion for summary judgment be granted and that its motion for sanctions be denied as moot.  To the extent that this Court does not adopt my recommendation on the motion for summary judgment, I recommend that the motion for sanctions be granted in part as follows: that Tavares, at his option, may either submit to being deposed regarding the untimely-produced documents or forego their use at trial, that an evidentiary hearing be conducted to determine whether this case must be dismissed as a sanction for the fraudulent alteration of a material document and that a limited purpose *pro bono* attorney (or engaged counsel if he is not financially eligible for *pro bono* counsel) be appointed to advise Tavares in light of the risk of perjury posed by such a hearing.

## I.      MOTION FOR SUMMARY JUDGMENT

### A.      Facts[3]

### 1.      Introduction

---

[3] These facts come from the parties' statements of disputed and undisputed facts, together with the documents attached to them, the Complaint and its attachments, the affirmation submitted by Tavares with its attachments, deposition excerpts and certain uncontroverted documents attached to Enterprise's motion for summary judgment. For ease of reference, the textual citations are to the electronic case file number.  These translate as follows:

| | |
|---|---|
| Complaint | ECF No. 4 |
| Attachments to Complaint | ECF No. 4-1 |
| Attachments to Motion for Summary Judgment | ECF No. 117-2 through 117-13 |
| Enterprise's Statement of Undisputed Facts ("SUF") | ECF No. 118 |
| Attachments to Enterprise's SUF | ECF No. 118-1 through 118-15 |
| Piccolo Deposition Excerpts | ECF Nos. 118-3, 131-1 |
| Tavares Deposition Excerpts | ECF No. 118-4 |
| Hall Deposition Excerpt | ECF No. 118-12, ECF No. 131-3 |
| Tavares Affirmation (Sanctions) | ECF No. 125-2 |
| Attachment to Tavares Affirmation (Sanctions) | ECF No. 125-3 |
| Tavares Affirmation  (Summary Judgment) | ECF No. 126-1 |
| Attachments to Tavares Affirmation (Summary Judgment) | ECF No. 126-2 through 126-12 |
| Tavares's Undisputed and Disputed Facts | ECF No. 128-1 |
| Attachments to Enterprise's Summary Judgment Reply | ECF No. 131-1 through 131-4 |
| Enterprise's Statement of Disputed Facts ("SDF") | ECF No. 133 |
| Attachments to Enterprise's SDF | ECF No. 133-1 through 133-2 |

The recited facts are undisputed unless they are described as disputed in the text.

Tavares, born in the Cape Verde Islands, has a light but non-white complexion. He is a practicing Muslim who, at all relevant times, has worn to work a traditional Muslim head covering called a kufi as part of his religious practice. ECF No. 126-1 at 1-2, ¶¶ 2, 4. According to the medical records that he attached to his Complaint,[4] throughout the relevant period, Tavares suffered from major depressive disorder and psychotic disorder and was being treated by a psychiatrist for those illnesses. ECF No. 4-1 at 29-33. Enterprise does not dispute Tavares's claim that he had completed his bachelor's degree at Rhode Island College before applying for a job at Enterprise. ECF No. 126-1 at 1-2, ¶¶ 3, 5. Nor does Enterprise dispute his claim that, prior to applying for a position at Enterprise, from 2003 until 2007, Tavares worked as a manager at Brooks Pharmacy.[5] ECF No. 126-1 at 2, ¶ 5; ECF No. 126-2 at 3.

Enterprise is in the business of automobile rental, leasing, and sales. ECF No. 118 at 1, ¶ 1. Its Business Ethics & Personnel Policies ("Personnel Policies") include an "open door policy" that lays out how employees may bring up issues, problems or complaints relating to working conditions and directs that the manager may be approached, but if the issue is not resolved, employees may go to the group general manager or the Human Resources department. ECF No. 118-1 at 29. The Policies also include a separate policy banning sexual harassment and making clear that a sexual harassment complaint may be brought directly to Human Resources if the

---

[4] The only medical records considered in this report and recommendation are those placed in the record by Tavares himself, who attached them to his Complaint. ECF No. 4-1 at 29-33. Numerous other medical records have been produced and filed under seal by Enterprise; with one exception, I have not considered any of them because they are neither authenticated nor explained. The exception is a doctor's note regarding Tavares's need for an accommodation in the number of hours worked per week. ECF No. 136 at 49. I have considered it because Tavares referred to it specifically in his affirmation. ECF No. 126-1 at 8, ¶ 37.

[5] Tavares himself placed in the summary judgment record at least three references suggesting that his prior employment was not at Brooks Pharmacy but rather was at Kelly's Carwash or at a Shell gas station/retail store for MVC Enterprises. See, e.g., ECF No. 126-3 at 3 (Tavares's "new hire sheet" lists Kelly's Carwash/Mobil for prior work experience); ECF No. 126-7 at 3 (Tavares's statement refers to "previous employer Kelly's Mobil"); ECF No. 125-3 at 6 (Tavares's interrogatory answer states that in 2007 he worked at Shell gas station/retail store for MVC Enterprises). Because, for purposes of summary judgment, Enterprise does not dispute the claim that Brooks was the prior employer, I accept it as undisputed.

3

employee does not feel comfortable raising it with the manager, as well as that retaliation for making such a complaint is prohibited.  Id. at 32.  The Policies similarly ban any discrimination, harassment or retaliation arising from race, color, religion, sex, national origin or disability, to which the "open door policy" of reporting complaints also applies.  Id. at 28.  It is undisputed that, on the day he started working at Enterprise (April 30, 2008), Tavares signed both the stand-alone sexual harassment policy and an acknowledgement that he had received and read the company's Personnel Policies.  ECF No. 118-2 at 2-3.  Tavares signed another acknowledgment that he had received and read the Personnel Policies on August 6, 2009.  Id. at 4.  There is a third acknowledgment form in the record, but it is undisputed that Tavares did not sign it.  Id. at 5.

On April 30, 2008, Tavares applied for a management trainee position at Enterprise. ECF No. 126-2 at 2.  With respect to whether he completed college, his application form inconsistently states that he has a "B.S." degree, but also states that he had not yet graduated from college and that he had earned an associate's degree.[6]  ECF No. 126-3 at 2-3.  Enterprise offered Tavares a part-time position as a driver, which he accepted.  ECF No. 118 at 1, ¶¶ 2-3; ECF No. 118-3 at 3.  In his affirmation, Tavares avers that he is now suspicious that discrimination is the reason he was not hired for a management position: "I have come to believe that the discrimination against me because of my religion commenced from my application for employment."  ECF No. 126-1 at 2, ¶ 9.  This allegation appears to be based only on the unexplained inconsistency in his job application regarding his level of higher education.  Id.

The parties dispute when Tavares first made Enterprise aware of his mental health disability and his need for an accommodation in the number of hours he could work per week. Tavares avers that, shortly after he was offered the driver position, he "informed Enterprise" that

---

[6] The summary judgment record does not reveal who filled in each of these inconsistent portions of the application form.

he "was diagnosed with a mental disability for cognitive and emotional impairment" and Enterprise agreed to accommodate him by allowing him to work twenty to twenty-four hours per week.  ECF No. 126-1 at 3, ¶¶ 11-12.  Enterprise contends that it did not become aware of the disability and the need for an accommodation until a month after Tavares started work when he was asked to work full-time and he responded with a June 3, 2008, letter from his psychiatrist, Dr. Ragheb, who wrote that Tavares "is currently receiving treatment . . . [and] is in complete remission with no residual symptoms"; the letter states that Tavares had been "advised . . . to work part-time (20-24 hrs/wk) jobs only to prevent relapses."  ECF No. 4-1 at 26.

2.   Sexual Harassment and Hostile Work Environment – June 2008 until October 2010[7]

Tavares's initial supervisor was an African-American woman named Michelle Whyte.  ECF No. 126-1 at 3, ¶¶ 13, 27; ECF No. 126-5 at 3.  He clashed with her over a wide range of matters, beginning with her demand soon after he started that he work thirty to forty hours per week.  He claims this was contrary to what had been agreed upon when he was hired and that he had to procure the June 3, 2008, letter from Dr. Ragheb as a result of Whyte's demand that he document his need for a specific accommodation.  ECF No. 126-1 at 3-4, ¶¶ 13-15; ECF No. 126-4 at 2.  Enterprise claims that this was the first time that it was placed on notice of his disability and the need for an accommodation in terms of hours worked per week.  Once Enterprise received Dr. Ragheb's letter, it provided the requested accommodation; there is no evidence suggesting Tavares was ever required to work past the recommended number of hours.

---

[7] As discussed in detail in connection with the sanctions motion, *infra*, Tavares has provided an array of not-entirely-consistent descriptions of the incidents he perceived as sexual harassment and discrimination, resulting in a hostile work environment at Enterprise through October 2010.  One of those statements, which is attached to Tavares's affirmation, is the accused "forgery," ECF No. 126-10, whose provenance is placed in issue by the sanctions motion.  ECF No. 119-5 at 2-5.  For purposes of summary judgment, I have disregarded Enterprise's claim that it is a fraud and considered its contents, assuming that Tavares showed it to the Enterprise Human Resources Manager on October 7, 2010.

Tavares made no further complaint about being required to work more than the number of hours recommended by his physician.

Tavares believes that Whyte disclosed details of the content of the letter to his coworkers; the facts he presents to buttress this claim are Whyte's possession of Dr. Ragheb's letter and conversations between Tavares and coworkers who asked him about the nature of his illness and the medications he was taking.  ECF No. 126-1 at 4, ¶ 17.  However, the Ragheb letter says nothing about the nature of Tavares's illness; when Whyte was questioned by Enterprise during its investigation of Tavares's complaints about her, she claimed to have no knowledge of why Tavares needed to be accommodated and denied having shown his doctor's letter to coworkers. ECF No. 118-6 at 18; ECF No. 126-4 at 2.  Beyond Tavares's suspicions, there is no evidence establishing either that any coworker ever saw the letter or that any learned about Tavares's illness from Whyte.

At approximately the same time, also in June 2008, Tavares alleges that Whyte committed the first act that he claims amounts to sexual harassment: she showed him pictures of herself when she was younger and thinner.  ECF No. 126-5 at 2; ECF No. 126-10 at 3.  This made him believe she was "advertising herself as available"; he "felt uncomfortable."  ECF No. 126-5 at 2.  There is no evidence that he said or did anything about this discomfort.

Tavares's next clash with Whyte arose from an incident almost a year later, in April 2009, when Whyte changed Tavares's duties from driver to "car prep."  ECF No. 126-1 at 4, ¶ 18.  Tavares considered this change a demotion, because the only other person working that job had a mental disability, it was a less responsible position and it involved working under harsher conditions.  Id. ¶¶ 18-19.  Whyte told him she gave him the assignment because he was "young, physical fit, efficient and accountable."  ECF No. 126-5 at 3.  Tavares insisted on being restored

to his old job and presented Whyte a letter from his psychiatrist, stating that "over the past weeks, some symptoms re-emerged . . . [which] appears to be connected to a change in his job where he was assigned more intricate work duties that overtaxed his fragile cognitive and emotional system." ECF No. 4-1 at 27. Enterprise provided the requested accommodation; Tavares was moved back to the driver position he preferred. ECF No. 126-5 at 3-4; <u>see</u> ECF No. 126-10 at 3 ("After receiving this letter, [Whyte] then fully cooperated.").

Meanwhile, also in 2009 and in 2010, there were a series of seven incidents involving Whyte and conduct that Tavares found to be sexually harassing. First, on an occasion when her sixteen-year-old sister and others were in her office, Whyte put her hand on her hip, started to dance seductively and asked, "[c]an you handle my ass?" ECF No. 126-1 at 5, ¶ 21; ECF No. 126-5 at 2; ECF No. 126-10 at 3-4. Second, on an occasion when Whyte was talking to another worker in a hallway, she deliberately bumped her body into Tavares as he tried to pass and asked if he was trying "to touch my ass." ECF No. 126-1 at 5, ¶ 21; ECF No. 126-5 at 2; ECF No. 126-10 at 4. Third, Whyte showed Tavares her wedding pictures; when Tavares asked if a light skinned person was her husband, she said she does not like light skinned people and asked Tavares if he considers himself black. ECF No. 126-5 at 3; ECF No. 126-10 at 4. Fourth, in the presence of other workers, Whyte hugged Tavares for doing a good job and asked a coworker who was present whether her action constituted sexual harassment. ECF No. 126-5 at 3. Fifth, at a time when four other employees were present, Whyte looked at Tavares's (unzipped) pants zipper and said, "That is big! Is that all yours?" <u>Id.</u> at 2; ECF No. 126-10 at 4. Sixth, "[o]n several occasions," Whyte touched his muscles; according to his testimony, after the third time, he asked her to stop and she did. ECF No. 118-4 at 7; ECF No. 126-1 at 4 ¶ 20; ECF No. 126-5

at 2.  Seventh, she called him "eye candy," which he considered "a nice compliment, but, again, I'm not sure what her intention was, so . . . ."  ECF No. 118-4 at 10.

In September 2010, Tavares sat down with Whyte to talk.  According to one description of the meeting, authenticated by Tavares in his affirmation, ECF No. 126-1 at 5, ¶ 24, their discussion focused on the issues that he believed she was facing as a result of misconduct by his coworkers (such as cheating on time cards and engaging in personal activities while long-distance driving); based on what he had learned from earning his management degree, he offered to help her with these issues.  ECF No. 126-5 at 6 ("I sat down with Michelle and discussed some of these issues that were happening among the employees.  I tried to help her correct the problems since I had a degree in Management I was trying to give her some management advice.").  According to the version in another of Tavares's statements, this discussion was "about issues that had came up between involving Michelle [Whyte] and co-workers about harassment in the work field" and "was meant resolve the current issues"; during the meeting, Tavares claims that Whyte "admitted . . . 'I have done evil things to employees!'" and "as a woman of faith I wonder if I would be going to heaven or hell for what I've done."  ECF No. 119-5 at 2.  According to Whyte, at their meeting, Tavares asked "if any of the drivers were speaking about him."  ECF No. 118-6 at 17.

After this meeting with Whyte, Tavares believed that he was being harassed by all of his co-workers.[8]  ECF No. 126-5 at 6.  As a result, finally invoking the procedure in the Policies, he brought his concerns to Kristen Piccolo, a Human Resources Manager, with whom he met on October 6 and 7, 2010.  Id. at 2; ECF No. 126-7 at 2.  Until the meetings with Piccolo, according

---

[8] Tavares has supplied only one example of coworker conduct that he believes reflects the retaliation that he claims occurred after the meeting with Whyte and before the meeting on October 7, 2010, with Human Resources: on October 1, 2010, he claims he approached a coworker with a question and was told to leave his office "because we cant trust you."  ECF No. 126-10 at 3.  The same coworker spoke of killing people.  Id.

to the statement prepared on October 7, 2010, Tavares never brought Whyte's actions to anyone's attention because he felt badly for Whyte who was a single parent and "is a role model a minority leader."  ECF No. 126-5 at 5.

At the October 6, 2010, meeting, Tavares told Piccolo about Whyte's conduct that he considered harassing, as well as about the issues he had had with coworkers, such as a group of workers who once joked about "hunting" and referred to a bystander as a "black piece of shit." Id. at 4.  ECF No. 126-10 at 5.  In another version of what he told Piccolo, Tavares claimed that he complained that, "the harassment not only came from select Co-workers but also both Michelle [Whyte] and her superior Franco [and] . . . consisted of direct/indirect Name-calling, inappropriate conversations about guns/shooting/violence, sexual harassment, and direct threat on and off the work field."  ECF No. 126-10 at 2-5.  Yet another version of what he told Piccolo was submitted to Rhode Island Commission for Human Rights ("RICHR").  ECF No. 126-7 at 2 ("there was too much of unethical gossiping going on between co-workers that evolved in a personal matter and I did not want to take part of it").  Piccolo tried to prepare a typed summary of his statement to use as a basis for her investigation but Tavares continued to edit it over several days and then refused to sign it.  See ECF No. 126-5.  Piccolo told Tavares she would investigate all of his complaints, which she started to do immediately, ultimately interviewing and getting statements from Whyte and ten other workers (four women and six men) between October 7 and 21, 2010.  ECF No. 118-6 at 8-32.

During the investigation interviews, one male worker confirmed that he had seen Whyte drape an arm over a driver's shoulder and give a pat on the back, saying, "you're my favorite driver," which the worker did not find to be out of the ordinary.  Id. at 10.  One female worker confirmed that she had heard Whyte make inappropriate comments about her "butt," but these

were not directed to a specific person.  Id. at 8.  Another female worker reported that she, Whyte

and Tavares spoke about families and girlfriends, "nothing out of the ordinary," and denied

hearing anything she considered inappropriate.  Id. at 14.  A male worker confirmed that the

"drivers mak[e] comments to Michelle Whyte.  Such as . . . saying you are taking up too much

room in the doorway" to which she responds with a comment about the size of her "butt," and

that workers of color, including Whyte, Tavares and others, joke about "being black."  Id. at 16.

He did not consider any of these comments inappropriate and said he believed the working

environment was "very comfortable."  Id. at 16.  Otherwise, the coworkers denied saying or

hearing the racial and sexual remarks described by Tavares.  See, e.g., id. at 21, 23.

Whyte's statement to Piccolo confirms that Tavares had met with her in September 2010

but she said that he wanted to ask if other drivers were talking about him and to discuss an

incident when a driver showed Tavares a knife while they were socializing at the other's home.

Id. at 17.  She also confirmed that she had "felt his muscles," but thought he wanted her to do so;

she confirmed that she had participated in conversations in the "general setting," when he and

other workers were present, regarding relationships and girlfriend complaints and that these may

have included "inappropriate" subject matter.  Id. at 17-18.  Otherwise, she denied his version of

their interactions.  Id.

Based on this investigation, Piccolo concluded that Whyte had used inappropriate and

offensive language, required her to attend sexual harassment training and directed her to be

proactive in managing employees under her supervision with respect to language.  Id. at 20.

Nevertheless, Piccolo also concluded that Tavares's claim of sexual harassment directed at him

was not substantiated and that Whyte had not released Tavares's medical information.  ECF No.

118-7 at 2; ECF No. 126-1 at 5, ¶ 26.  Rather, based on what Tavares himself told her, Piccolo

concluded that the source of whatever coworkers knew about Tavares's illness was likely whatever Tavares himself had told them.  ECF No. 118-7 at 2.  In "an abundance of caution," Piccolo advised Tavares that a harassment and discrimination prevention training would be conducted for the entire group of workers.  Id.  Her letter reminded Tavares that Enterprise would not tolerate any retaliation against employees like him, who had lodged complaints.  Id. at 3.

Before Piccolo's investigation was completed, on October 12, 2010, buttressed by a letter from Dr. Ragheb, ECF No. 118-9 at 3, Tavares requested and was granted a medical leave of absence.  ECF No. 118 at 2, ¶ 10.  Tavares avers that he needed the medical leave because "[t]he sexual harassment from Whyte was so disturbing to me."  ECF No. 126-1 at 6, ¶ 29.  Almost three months later, in a letter written on January 4, 2011, Dr. Ragheb released Tavares to return to "his original work duties" on January 10, 2011, with the same limitation on total hours worked per week.  ECF No. 4-1 at 28.  By the time Tavares's medical leave was over, Whyte was no longer employed at Enterprise; Tavares's new supervisor was Evan Hall.  ECF No. 118-4 at 17-18; ECF No. 126-7 at 3.  Once Tavares complained in October 2010 about sexual harassment, he was never troubled by Whyte again.  ECF No. 118-4 at 18.  After Tavares returned from the medical leave of absence, he was restored to his former position and never complained again of sexual harassment.

### 3. Post-Leave Retaliation for Sexual Harassment Complaint and Racial and Religious Discrimination – January 2011 until November 2011

Immediately following Tavares's complaint to Piccolo about Whyte on October 6 and 7, 2010, (and before Piccolo completed her investigation) the medical record reflects Tavares's belief that Enterprise was retaliating against him because of the Whyte complaint.  Specifically,

less than a week later, on October 12, 2010, the day Tavares went out on medical leave, Dr.

Ragheb wrote:

> Not doing as good this time, more problems at work, some appeared reasonable, but others seems less grounded in reality. Pt is feeling he is being constantly harassed, discriminated against, colleagues talking about him, and trying to instigate him, even feels police patrol cars are being sent to follow him on the road to bother him by connected people at work.

ECF No. 4-1 at 29.  Two weeks later, on October 25, 2010, a psychiatric evaluation includes the

following:

> The patient states he has been feeling very angry & confused.  He states his main stressors include what he states as both verbal & sexual harassment in the workplace.  He states he has filed complaints [with] human resources but feels his co-workers are retaliating.  He has also become increasingly worried that if he returns to work from his leave of absence, they will turn against him even more.

Id. at 33.  Shortly after Tavares's return to work, at a January 26, 2011, appointment, Dr. Ragheb

noted, "he has been noticing subtle 'mental testing' by people making remarks and innuendoes at

him."  Id. at 30.  Dr. Ragheb wrote that he "gently tried challenging [Tavares's] assumptions

about the illness and symptom origins, but without success."  Id.  On February 9, 2011, Tavares

told Dr. Ragheb that he is avoiding his co-workers "but is certain that they are talking about him,

but does not know what they are saying."  Id. at 31.

Consistent with these medical references that Tavares incorporated into his Complaint,

Tavares avers that he believed that coworkers and his supervisors began to retaliate for the

complaint to Piccolo about Whyte's sexual harassment immediately after his return from leave.

ECF No. 126-1 at 6, ¶ 30.  On February 20, 2011, he emailed Piccolo to complain about being

asked to move a car contrary to protocol and to work in proximity to co-workers suffering from

colds, as well as to report his observation that "since January 13th (medical leave of absence) I

have been experiencing direct and subliminally irrigated retaliation."  ECF No. 126-6 at 2-3.  In

response, Piccolo suggested that Tavares meet with her and her superior, which occurred on March 9, 2011.  ECF No. 118-11 at 4.  In a statement filed with RICHR, he describes the complaints that he made at that meeting: other employees not handling time cards correctly, harassing phone calls at home from a coworker, a coworker who asked the name of Tavares's doctor, "so I can get the winters off too," being assigned to drive without an E-Z pass so he had to take a longer route than other workers, and his belief that "[m]y job is specifically structured with several mixed messages such as using psychological tactics using colors as ways to convey a message subliminally."  ECF No. 126-7 at 2-7.  On March 15, 2011, Tavares filed a police report[9] complaining that an unknown male came to his home; he linked this to a complaint he had made to Enterprise about a coworker.  ECF No. 4-1 at 35.  He told the police that he overheard coworkers saying that "I was traitor, because I am a Muslim, and that I deserve to be killed" and that one of his coworkers has a "connection with the Providence Police Department" so that "everything I have stated on my phone has been brought up indirectly . . . [t]he reality is that because of the complaint that I made, the retaliation is in fact present."  Id. at 36.

Two weeks later, on May 31, 2011, Tavares filed his first Charge of Discrimination with RICHR.[10]  ECF No. 117-2 at 2.  It alleges discrimination based on race, color, national origin, religion and mental disability and retaliation for opposing unlawful employment practices; the charge highlights Whyte's behavior from the pre-October 2010 period, harassing phone calls at home from coworkers, the incident when he was asked to drive without an E-Z pass and remarks about shooting and guns by coworkers.  Id. at 3.  Tavares claims that, after he filed the charge,

---

[9] The summary judgment record does not reveal what, if anything, happened as a result of this police report.

[10] Tavares claims he filed the Charge on March 8, 2011, based on a statement he prepared that is date-stamped as received at RICHR on March 8, 2011.  See ECF No. 126-1 at 7, ¶ 32; ECF No. 126-7 at 2.  The formal Charge itself is dated May 31, 2011.  ECF No. 117-2 at 2.

the "acts of retaliation by co-workers and Enterprise supervisors increased."  ECF No. 126-1 at 7, ¶ 33.

In June 2011, Tavares resumed the stream of complaints to Piccolo; as with every complaint she received from Tavares, she investigated each one by interviewing the accused worker and any witnesses and getting signed statements from each.  ECF No. 126-6 at 4.  For example, Tavares accused a coworker of joking about his religious head cover and asking if he "even learn Islam or Arabic and . . . thought [he] was Muslim."  Id. at 6-7.  The accused coworker told Piccolo that he had simply asked whether Tavares had converted to Islam in what he thought was friendly conversation, but that Tavares took umbrage, saying, "save your derogatory comments for later."  ECF No. 118-11 at 5.  Tavares accused another worker of "flicking his middle finger," ECF No. 126-6 at 7, while the worker adamantly denied that he had done so.  ECF No. 118-11 at 9-10.  In August 2011, Tavares emailed Piccolo to complain about what he believed was coworker misconduct in connection with the lunch break.  ECF No. 126-6 at 9.  In September, he complained again about lunch policy, about time card protocols, about an incident where other drivers failed to pick him up, forcing him to walk, and about a coworker who he said compared him to an extremist with a threatening appearance.  Id. at 11-13.  The workers accused of not picking him up (until several were sent to get him after he called) told Piccolo that they had either not seen him or not realized he needed a ride.  ECF No. 118-11 at 15, 20, 24.  The coworker accused of the terrorist comment denied saying that, but did report that another worker had said that Tavares tended to be friendly if he wore a baseball cap, but became a different person when wearing a kufi.  Id. at 17.

In October 2011, Tavares complained that a branch manager told him she hoped his wife would die, that another worker referred to dead bodies at a lake, that his name was spelled

incorrectly on his time card, that another worker called him a terrorist, that a worker said he must

be punished for good deeds, that he had been asked to complete an employee survey, and that he

had come to the conclusion that "upper management are involved."  ECF No. 126-6 at 18-19.

For the complaints about Enterprise, such as the employee survey, Piccolo gently tried to assure

Tavares that nothing nefarious was intended.  Id. at 16.  For the complaints against coworkers,

each one denied the accusations, although in some instances the accused coworker described a

similar incident that the worker believed Tavares had misinterpreted.  For example, the coworker

whom Tavares heard saying that he (Tavares) must be punished for good deeds recalled making

a similar statement, albeit with very different meaning, that the worker speculated Tavares

overheard and misinterpreted.  ECF No. 118-11 at 31 (worker claims he said to someone else

"[n]o good deed goes unpunished," which comment had nothing to do with Tavares).

Throughout the extensive written communications between Piccolo and Tavares, her responses

to Tavares are consistently courteous, patient, informative and appropriate.  Nevertheless,

without asserting any factual basis for his belief, Tavares now challenges Piccolo's many

investigations, arguing that she consistently resolved the conflicting versions of each complaint

in favor of the non-Muslim, white perpetrator.  ECF No. 128-1 at 7.

 In addition to the complaints documented in the email and statements that Tavares made

or wrote as the events were unfolding, during the litigation, Tavares has added new facts that he

believes evidence discrimination and retaliation.  For example, at some unspecified point in time,

while conceding that Enterprise had no policy barring him from wearing his kufi and that he

wore it every day, ECF No. 118-4 at 13-14, Tavares claimed that his supervisor Hall tried to

discourage him from wearing it, that coworkers made derogatory remarks that it made them

uncomfortable, and that Hall offered him a cap or a "hoodie" with an Enterprise logo because

coworkers felt threatened by the kufi.  Id.; ECF No. 126-1 at 8, ¶ 38.  In addition, Tavares claims

that another form of continuing discrimination was Enterprise's ongoing questioning of his

mental disability.  ECF No. 126-1 at 7-8, ¶¶ 36-37.  As evidence, he points to an October 2011

email from Piccolo expressing her concern that Tavares was working more hours than his

psychiatrist had recommended and asking for a note from the treating physician confirming

Tavares's claim that his increased hours were not in excess of what was medically appropriate.

ECF No. 126-6 at 10.  Tavares claims that this request amounted to "continued questioning of

my medical disability" and religious discrimination in that no other non-Muslim person was

asked to produce a letter from a doctor whose opinion had not changed.  ECF No. 126-1 at 7-8,

¶¶ 36-37.  Soon after Piccolo made this request, Tavares supplied a letter from one of his treating

physicians.  ECF No. 136 at 49.  Contrary to what Tavares claims, the letter reveals that doctor's

medical opinion did change.  Compare ECF No. 4-1 at 26 (letter of June 3, 2008, states work

limited to "part-time (20-24 hrs/wk)"), with ECF No. 136 at 49 (letter of October 17, 2011, states

that limit "increased to (22-26 hours per week) as of this date").

　　　　Another newly developed claim is Tavares's argument that Enterprise's pattern of "trying

to hide their discriminatory conduct toward [him]" is evidenced by its "Workforce Profile," a list

of its employees produced in discovery at ECF No. 126-12 at 2, which classifies each racially as

"White," "Hispanic/Latino" or "Black/African American."  Tavares finds relevant the fact that

he is listed on this document as "White."  ECF No. 126-1 at 10, ¶ 47.  Human Resources

Manager Kristen Piccolo testified that this was "an error."  ECF No. 131-1 at 3.  And finally, at

the hearing on these motions, Tavares represented that, at trial, he plans to use certain late-

produced records[11] to buttress his claim that a photograph of bullet holes in a car and the theft of his wife's car tires from outside their home are both "somehow connected" to Enterprise's discrimination and retaliation against him.  ECF No. 119-3, 119-6, 119-8.

    4.     Conduct Resulting in Termination

On May 26, 2011, Tavares received an employment review from Enterprise prepared by his supervisor, Evan Hall.  ECF No. 126-8 at 3-7.  While he scored "meets requirements" for most categories on the form, for "vehicle operation (safe driver, acceptable MVR, etc.)," the review concluded that he "requires improvement," which it defines as "employee often fails to meet job requirements" and "improvement needed."  Id. at 3-5.  The review writer illustrated the criticism with an example: "there have been a couple of instances where you 'chirped' the tires of vehicles when exiting a branch."  Id.  Tavares signed the review, though he denied any recollection of "the incident," but also complimented his supervisor.  Id. at 6 ("you do show potential of a good manager in the future").

A second incident raising concerns about safe vehicle operation occurred on June 23, 2011, when Tavares received an "Immediate Correction Notice" from his supervisor for driving erratically, almost hitting a coworker, hitting another vehicle (although without causing damage) and driving over freshly painted lines; the Notice warns that failure to correct the incident could lead to termination.  ECF No. 118-13 at 2.  This incident was treated as serious enough that it was immediately reported to Piccolo, who spoke to Tavares about it.  ECF No. 118-3 at 11.  Tavares complained that he should not have been disciplined because he only tapped the other vehicle and caused no damage; otherwise he did not dispute that the incident occurred as

---

[11] These are the documents that are the subject of one aspect of Enterprise's motion for sanctions.  See ECF No. 119-2 through 119-5 and 119-8.  At the hearing on the motions, Tavares represented to the Court that he believes that these documents evidence additional discriminatory or retaliatory conduct by Enterprise.

described.[12]  ECF No. 126-1 at 7, ¶ 33.  In his next email to Piccolo, Tavares told her that it is consistent with a "personal vendetta" for him to be criticized for "tapping" another car without causing damage.  ECF No. 118-11 at 7-8.  Piccolo investigated this charge; a witness to the incident affirmed that Tavares had driven erratically and became so argumentative afterwards that he was asked to stay in the office for the rest of the work day.  Id. at 12.

The incident that led to Tavares's termination also gave rise to serious safety concerns. On November 9, 2011, Tavares was in an Enterprise vehicle driven by a co-worker.  According to Tavares, because the co-worker was speeding (over 90 miles per hour) on I-195, a busy highway, Tavares forced him to pull over by threatening to call the police, grabbed the car keys and ran away from the car, leaving both workers and the car stranded on an embankment of the interstate.  The incident resulted in Massachusetts State Police intervention.  ECF No. 126-1 at 8-9, ¶¶ 40-45.  Tavares further avers that the State Police officer told him that, if contacted, he (the officer) would say that he believed the other worker's story "that he had pulled over on the highway so that [Tavares] could urinate."  ECF No. 117-3 at 3.

Piccolo and another Human Resources manager performed an immediate investigation of this incident, which included an interview with Tavares, the other driver, an Enterprise employee sent to the scene and the Massachusetts State Police officer.  ECF No. 118-3 at 18-19.  During her investigation, as she testified, Tavares told her that he had directed the driver of the vehicle to pull over so he could urinate but also gave contradictory versions of what happened, causing her to find that he was not being truthful.  Id. at 18, 22-23.  Based on the investigation, Enterprise

---

[12] Tavares argues that it is disputed whether "tapping" other vehicles is a cause for discipline when there is no damage, pointing to the testimony of his supervisor Hall, who answered one question at his deposition with "I cannot recall." ECF No. 118-12 at 4.  Read in context, it is clear that Hall actually testified that hitting another vehicle is contrary to Enterprise policy, whether or not there is damage, and that Hall had disciplined other workers for doing so. Id. at 3-7.  Hall also testified that he knew that there had been no damage to the vehicle at the time he prepared the Correction Notice; he added a note to that effect when he wrote the Notice because Tavares was so upset. Id. at 7-8.

concluded that the other driver had pulled over to allow Tavares to urinate and that Tavares had grabbed the keys, stuck up his middle finger and run from the car onto the embankment. Id. at 23; ECF No. 118-15 at 3. Piccolo decided that Tavares's conduct was inappropriate and created a serious safety risk; following consultation with the general manager and local counsel, she determined that both Tavares and the other driver should be terminated. ECF No. 118-3 at 23; ECF No. 126-1 at 9, ¶ 44. The decision to terminate was implemented immediately and Tavares's employment with Enterprise ended on November 10, 2011. ECF No. 4 at 3-4; ECF No. 118-14 at 2.

### B.   Standard of Review

Under Fed. R. Civ. P. 56, summary judgment is appropriate if the pleadings, the discovery, disclosure materials and any affidavits show that there is "no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Taylor v. Am. Chemistry Council, 576 F.3d 16, 24 (1st Cir. 2009); Commercial Union Ins. Co. v. Pesante, 459 F.3d 34, 37 (1st Cir. 2006) (quoting Fed. R. Civ. P. 56(c)). A fact is material only if it possesses the capacity to sway the outcome of the litigation; a dispute is genuine if the evidence about the fact is such that a reasonable jury could resolve the point in the favor of the non-moving party. Estrada v. Rhode Island, 594 F.3d 56, 62 (1st Cir. 2010); Santiago-Ramos v. Centennial P.R. Wireless Corp., 217 F.3d 46, 52 (1st Cir. 2000) (quoting Sánchez v. Alvarado, 101 F.3d 223, 227 (1st Cir. 1996)). The evidence must be in a form that permits the court to conclude that it will be admissible at trial. See Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). In ruling on a motion for summary judgment, the court must examine the record evidence "in the light most favorable to, and drawing all reasonable inferences in favor of, the nonmoving party." Feliciano de la Cruz v. El Conquistador Resort & Country Club, 218 F.3d 1, 5 (1st Cir. 2000) (citing

19

Mulero-Rodriguez v. Ponte, Inc., 98 F.3d 670, 672 (1st Cir. 1996)).  There are no trial-worthy issues unless there is competent evidence to enable a finding favorable to the nonmoving party. Goldman v. First Nat'l Bank of Bos., 985 F.2d 1113, 1116 (1st Cir. 1993).  In considering Enterprise's motion for summary judgment, the Court must be mindful that employment discrimination cases involve elusive concepts such as motive or intent; nevertheless, summary judgment is appropriate if Tavares rests merely upon conclusory allegations, improbable inferences, and unsupported speculation.  Bonilla v. Electrolizing, Inc., 607 F. Supp. 2d 307, 314 (D.R.I. 2009); see Mariani-Colan  v. Dep't of Homeland Sec., 511 F.3d 216, 221 (1st Cir. 2007); Rathbun v. Autozone, Inc., 361 F.3d 62, 66 (1st Cir. 2004).

## C.   Analysis

Reading his *pro se* Complaint liberally, it seems that Tavares has brought six discrete claims.  The first is his claim that Whyte's sexual harassment, racial remarks and improper disclosure of medical information created a hostile work environment so severe as to alter the conditions of his employment, forcing him to take a medical leave of absence.  The second, and equally serious, claim is the post-leave allegation that Enterprise supervisors retaliated against him for complaining about Whyte's sexual harassment and the related RICHR Charge, culminating in his termination.  Third, also post-leave of absence, he alleges that Enterprise coworkers created a hostile work environment both because of his complaints about Whyte and because of his religion, race and national origin.  Fourth, he contends that his supervisor discriminated against him by refusing to accommodate his religious practice.  Fifth, he seems to allege that Enterprise failed properly to accommodate his disability.  Last is Tavares's newly-minted claim, based on what he learned in discovery, that Enterprise's decision to offer him the

position of driver instead of the management training position for which he claims he applied, was motivated by discriminatory animus.

As Enterprise suggests (and Tavares does not disagree),[13] these claims may be analyzed as arising pursuant to Title VII of the Civil Rights Act of 1964 ("Title VII"), including 42 U.S.C. § 2000e-2, which protects against employment discrimination based on national origin, race, religion and sex, and 42 U.S.C. § 2000e–3(a), which makes it unlawful for an employer to retaliate against employees for opposing any practice made unlawful by Title VII, or because the employee has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding, or hearing under Title VII. In addition, Enterprise suggests that Tavares's claims should be reviewed pursuant to the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12111(8), 12112(a), which forbids a covered employer from discriminating against a person with a disability "who, with or without reasonable accommodation, can perform the essential functions" of her job. Lang v. Wal-Mart Stores E., L.P., 813 F.3d 447, 454 (1st Cir. 2016).

For a *prima facie* Title VII case, in addition to the undisputed facts that he is a member of a protected class and was qualified for his job, Tavares must show that he suffered an adverse employment action that is either causally connected to his membership in a protected class or in retaliation for protected conduct. Bhatti v. Trs. of Bos. Univ., 659 F.3d 64, 70-71, 73 (1st Cir. 2011). In a case where there is an adverse employment action and no direct evidence of

---

[13] The Complaint does not name the statutory bases for Tavares's claims, leaving this Court to hypothesize what laws may be implicated. Enterprise's motion lists the obvious federal causes of action and Tavares has not argued that he asserts other causes of action. The obvious missing set of statutes are the state laws protecting against employment discrimination, such as the Rhode Island Fair Employment Practices Act, R.I. Gen. Laws § 28-5-7(1)(i)-(ii), the Rhode Island Civil Rights Act, R.I. Gen. Laws § 42-112-1, and the Rhode Island Civil Rights of Peoples with Disabilities Act, R.I. Gen. Laws § 42–87–1. Because the summary judgment standard applicable to these state law claims is substantially the same as the standard applicable to Title VII and ADA, if they were considered, my recommendation would remain unchanged. See Reilly v. Cox Enters., Inc., No. CA 13-785S, 2014 WL 4473772, at *7 (D.R.I. Apr. 16, 2014); Izzi v. United Parcel Serv., Inc., No. 04-321T, 2005 WL 3739295, at *6 (D.R.I. Oct. 28, 2005) (citing Kriegel v. Rhode Island, 266 F. Supp. 2d 288, 297 (D.R.I. 2003)); Russell v. Enter. Rent-A-Car Co. of R.I., 160 F. Supp. 2d 239, 265 (D.R.I. 2001).

discrimination, the Court must deploy the familiar decisional framework set out in <u>McDonnell Douglas Corporation v. Green</u>, 411 U.S. 792 (1973), which examines whether a plaintiff has made out a *prima facie* case, then shifts the burden of production to the defendant to articulate a legitimate nondiscriminatory reason for the action, and finally back to the plaintiff to demonstrate facts sufficient to establish that the reason is pretextual.  <u>Id.</u> at 802-04; <u>Pina v. Children's Place</u>, 740 F.3d 785, 796 (1st Cir. 2014).  And for his Title VII claim grounded in a hostile work environment to survive summary judgment, Tavares must present competent evidence that the environment was so objectively hostile and abusive as to permit a fact finder to conclude that the employer tolerated severe or pervasive harassment motivated by protected conduct.  <u>Rivera-Martinez v. Puerto Rico</u>, No. 05-2605, 2007 WL 16069, at *3-4 (1st Cir. Jan. 4, 2007) ("Title VII was not intended to be a 'general civility code'; therefore, conduct must be extreme to be actionable.").  Hostile work environment claims are subject to the employer's affirmative defense that it exercised reasonable care to prevent and promptly correct the harassing behavior and that the employee failed to avail himself of the opportunities provided by the employer.  <u>Burlington Indus., Inc. v. Ellerth</u>, 524 U.S. 742, 765 (1998); <u>Faragher v. City of Boca Raton</u>, 524 U.S. 775, 807-08 (1998); <u>see</u> Equal Emp. Opportunity Comm'n, <u>Enforcement Guidance: Vicarious Employer Liability for Unlawful Harassment by Supervisors</u>, 1999 WL 33305874 (E.E.O.C. Guidance June 18, 1999).

To state an ADA claim, Tavares must point to sufficient evidence showing that (a) he is disabled within the ADA's definition; that (b) he could perform the job's essential functions either with or without a reasonable accommodation; and that (c) the employer knew of his disability, yet failed to reasonably accommodate it.  <u>Lang</u>, 813 F.3d at 454.  Like a Title VII claim, a claim arising under ADA may be based on evidence of pervasive harassment arising

from the disability or retaliation for the exercise of ADA-based rights; courts considering such claims rely on the law developed under Title VII.  See Nunes v. Mass. Dep't of Corr., 766 F.3d 136, 144 (1st Cir. 2014); Gonzalez v. Sears Holding Co., 980 F. Supp. 2d 170, 209 n.18 (D.P.R. 2013); Marquez-Ramos v. Puerto Rico, No. CIV. 11-1547 SEC, 2012 WL 1414302, at *9 n.7 (D.P.R. Apr. 2, 2012); Higgins v. TJX Cos., Inc., 328 F. Supp. 2d 122, 124 (D. Me. 2004). Enterprise does not dispute that Tavares suffers from a serious mental disability or that he sought reasonable accommodation both in limiting the number of hours to be worked per week, and in retaining him in the driver's position instead of placing him in a position whose duties would "overtax[] his fragile cognitive and emotional system."  ECF No. 4-1 at 27.

Tavares's mental illness is a factor complicating this Court's consideration of the facts he has presented in support of his opposition to the summary judgment motion.  The Complaint itself includes medical observations by a treating psychiatrist suggesting that at least some of Tavares's perception of how Enterprise was treating him derives from his diagnosis of psychosis. Id. at 29 ("more problems at work, some appeared reasonable, but others seems less grounded in reality"); id. at 31 (he is "certain that [coworkers] are talking about him, but does not know what they are saying").  Some of his factual assertions are so bizarre as to suggest that they are the product of a distorted perception of reality or delusion.  See, e.g., ECF No. 126-6 at 2-3 ("I have observed that since January 13th I have been experiencing direct and subliminally irrigated retaliation"); ECF No. 126-7 at 7 ("[m]y job is specifically structured with several mixed messages such as using psychological tactics using colors as ways to convey a message subliminally"); id. at 6 (alleging harassment based on statement by coworker that "he is in fact the Devil and showed that his phone number displayed 666").  Others, when examined against the explanation procured by Piccolo's investigation, appear to be based on paranoia; for

example, Tavares claims that he was harassed with the threat that he must be punished for his good deeds, while his coworker said he used the familiar phrase, "[n]o good deed goes unpunished," which Tavares must have overheard.  ECF No. 118-11 at 31.  As one court addressing a similar challenge has noted, "[s]adly, these statements leave little doubt that plaintiff's mental illnesses are at the root of her allegations of sexual assault."  Wilson v. N.Y.C. Police Dep't, No. 09-Civ. 26632(ALC)(HBP), 2013 WL 878585, at *20 (S.D.N.Y. Feb. 6, 2013) (summary judgment granted because all of *pro se* plaintiff's claims of hostile work environment either legally insufficient or delusional).

I next proceed *seriatim* through each of Tavares's six Title VII/ADA claims; because none of them are supported by trial-worthy facts, this analysis leads to my recommendation that summary judgment should enter disposing of the entire Complaint.

1.      Hostile Work Environment Caused By Whyte, a Supervisor

Tavares alleges that his supervisor, Whyte, engaged in sexual and racial harassment sufficiently severe as to support a claim for a hostile work environment resulting in his October 2010 leave of absence.  He also asserts that Whyte showed his coworkers the psychiatrist's letter asking for accommodation, causing them to question him about his diagnosis and medication, exacerbating the hostile work environment.

When a hostile work environment claim is based on the harassing conduct of a supervisor like Whyte, the employee must establish that he was subject to uninvited, severe and pervasive harassment by his supervisor that was both objectively and subjectively offensive; the conduct must have created a work environment that would be intimidating, hostile or offensive to reasonable people.  See Murray v. Warren Pumps, LLC, No. 13-2133, 2016 WL 1622833, at *5 & n.1 (1st Cir. Apr. 25, 2016); Crowley v. L.L. Bean, Inc., 303 F.3d 387, 394-95 (1st Cir. 2002);

24

Wolf v. Nw. Ind. Symphony Soc'y, 250 F.3d 1136, 1143 (7th Cir. 2001).  Employer liability is automatic when supervisor harassment results in a negative employment action, subject only to the employer's affirmative defense that, when no tangible employment action is taken, it exercised reasonable care to prevent and promptly to correct the harassing behavior and that the employee failed to avail himself of the opportunities provided by the employer.  Burlington Indus., Inc., 524 U.S. at 765; Faragher, 524 U.S. at 807-08.  The test for whether the working environment has been made objectively and subjectively abusive is not "mathematically precise"; it requires a balancing of factors such as the frequency of the conduct, its severity, whether it was physically threatening or humiliating or a mere offensive utterance, and whether it unreasonably interfered with an employee's work performance.  Harris v. Forklift Sys., Inc., 510 U.S. 17, 22 (1993); Colon-Fontanez v. Municipality of San Juan, 660 F.3d 17, 44 (1st Cir. 2011).  A hostile work environment is not created by teasing, offhand or vulgar comments and isolated incidents.  Kosereis v. Rhode Island, 331 F.3d 207, 216 (1st Cir. 2003).

The first flaw in Tavares's claim about Whyte is that, even if his version of Whyte's sexual conduct is accepted, most of it does not amount to discrimination based on sex.  As the Supreme Court has emphasized, "[w]e have never held that workplace harassment, even harassment between men and women, is automatically discrimination because of sex merely because the words used have sexual content or connotations."  Oncale v. Sundowner Offshore Servs., Inc., 523 U.S. 75, 80 (1998).  As described by Tavares and fleshed out in the statements of coworkers procured by Piccolo during her investigation,[14] most of Whyte's vulgar or sexual remarks were directed equally to other men and to women.  Therefore, they are not discriminatory and fail to substantiate a Title VII hostile work environment claim.  Fontanez-

---

[14] While Tavares disputes Piccolo's conclusion that he was not the victim of sexual harassment, he has presented no evidence to controvert the statements of other employees about their perceptions of Whyte's conduct.

Nunez v. Janssen Ortho LLC, 447 F.3d 50, 57 (1st Cir. 2006) (vulgar remarks directed to many employees may be inappropriate and unprofessional, but mere offensive utterances do not amount to actionable harassment); Burns v. Johnson, 18 F. Supp. 3d 67, 75 (D. Mass. 2014) ("if a defendant's conduct is equally harsh towards men and women, there is no hostile work environment based on sex"); Garcia v. V. Suarez & Co., 288 F. Supp. 2d 148, 160 (D.P.R. 2003) (salesmen touching each other's buttocks and making sexually explicit remarks may be inappropriate but such conduct does not substantiate Title VII claim). Whyte's self-deprecating comments to male and female workers alike about the size of her "butt," hugging or putting an arm over the shoulder of various workers to praise good work, swinging her hips when her sister (and others) visited her office and the use of a vulgar remark to tease Tavares about an unzipped pants zipper (in the presence of others) all fall into this category. Kosereis, 331 F.3d at 216 (hostile work environment generally is not created by simple teasing, offhand comments, and isolated incidents); Russell v. Enter. Rent-A-Car Co. of R.I., 160 F. Supp. 2d 239, 261 (D.R.I. 2001) (offensive utterances and offhand comments do not amount to discriminatory changes in the terms and conditions of employment nor do isolated sexual advances, without more, constitute an abusive environment under Title VII) (citing Faragher, 524 U.S. at 788, and Chamberlin v. 101 Realty, 915 F.2d 777, 783 (1st Cir. 1990)).

The balance of what Tavares claims is Whyte's sexual misconduct – touching Tavares's muscles three times and (as perceived by Tavares) flirting with him by calling him "eye candy" and showing him pictures of her younger, thinner self – is inappropriate as Enterprise concluded when Whyte was disciplined for it, but is legally insufficient to be labeled as "extremely serious." Faragher, 524 U.S. at 788; see Mann v. Lima, 290 F. Supp. 2d 190, 198 (D.R.I. 2003) (two touches and series of compliments may be tasteless and inappropriate but do not come close

to level of severity or pervasiveness for claim to survive summary judgment).  While Tavares

may have experienced subjective discomfort, Tavares's descriptions of this conduct does not

amount to evidence sufficient to allow a reasonable jury to find that he was subjected to an

objectively hostile work environment.  Rivera-Martinez, 2007 WL 16069, at *3-4.  Indeed, the

evidence of flirtation is at best speculative, since Whyte never said or did anything to suggest she

was trying to coerce Tavares into an unwanted sexual encounter; Tavares himself dispels the

specter of an unwelcome flirtation with another complaint he makes about Whyte – that she told

him that she did not find light-skinned men of color attractive.  Similarly, three unwelcome

muscle touches – Whyte promptly stopped when Tavares asked her to – simply do not come

close to the frequency and severity of conduct that is actionable.  See Harris, 510 U.S. at 21-23.

Accepting that a fact finder would credit Tavares's version of these incidents, they are

insufficient as a matter of law to create the abusive work environment that is actionable under

Title VII.  Rivera-Martinez, 2007 WL 16069, at *3-4 (two incidents of touching neither severe

nor pervasive); Crespo v. Schering Plough Del Caribe, Inc., 231 F. Supp. 2d 420, 425, 428-30

(D.P.R. 2002) (isolated incidents that included hugging from behind and telling plaintiff she

looks sexy in skirts insufficient to support hostile work environment claim).

Tavares's claim that Whyte engaged in conduct amounting to discrimination based on his

race/national origin is even more lacking in merit.  Her only racial remarks were the comment

about Tavares's skin not being very dark and one occasion when she asked him if he considered

himself to be black.  The first remark seems to do no more than dispel Tavares's impression that

Whyte was sexually attracted to him, while it is utterly implausible to posit that the latter is the

result of discriminatory animus or created a hostile working environment.  Inconsistently,

Tavares described Whyte as "a role model a minority leader."  ECF No. 126-5 at 5.

Similarly, Tavares's claim that Whyte discriminated against him based on his disability fails for the lack of any admissible facts to buttress the allegation.  His claim that she told his coworkers the details of his mental illness in Dr. Ragheb's accommodation letter is belied by the text of the letter, which states only that he is "in complete remission with no residual symptoms" but that he cannot work more than a specified number of hours per week.  ECF No. 126-4 at 2. Further, Tavares has not disputed Piccolo's conclusion that whatever coworkers knew was likely based on what Tavares himself told them.  ECF No. 118-7 at 2.  Moreover, as described by Tavares, the coworker comments about his mental health are far from severe and pervasive – Tavares claims that one worker with a disabled child asked Tavares about medication and another worker joked about wanting a diagnosis so he could get the winter off.  ECF No. 126-1 at 4, ¶ 17; ECF No. 126-5 at 4; ECF No. 126-7 at 6.  These do not come close to establishing a hostile work environment that was both objectively and subjectively offensive to reasonable people.  Murray, 2016 WL 1622833, at *6 (isolated, stray remarks about disability cannot provide adequate foundation for a hostile work environment claim).

In addition to the utter absence of trial-worthy facts establishing a hostile work environment caused by Whyte's conduct, this aspect of Tavares's claims falters because the undisputed facts also establish that Enterprise can sustain its burden of demonstrating the availability of the Faragher-Ellerth affirmative defense.  This defense posits that the employer cannot be liable under Title VII if it can show that there was no tangible employment action (such as discharge, demotion or undesirable reassignment)[15] and that (1) the employer "exercised reasonable care to prevent and correct promptly" any harassing behavior; and (2) the plaintiff "unreasonably failed to take advantage of any preventative or corrective opportunities provided

---

[15] Tavares does claim to have been "demoted" briefly; the reason why this is not an adverse employment action is discussed _infra_.

by the employer or to avoid harm otherwise." Burlington Indus., Inc., 524 U.S. at 765; Faragher, 524 U.S. at 807-08.

Here, it is undisputed that Enterprise implemented the Personnel Policies and that the content of those Policies had been communicated to Tavares.  It is undisputed that Tavares failed to take advantage of the Policies in that he claims he suffered for almost a year and a half under Whyte's alleged harassment without bringing his complaints about her either to Whyte herself or to the Human Resources department, as provided by the Policies.  Rigau v. Pfizer Caribbean Corp., 525 F. Supp. 2d 272, 286 (D.P.R. 2007) (plaintiff's six month delay in reporting series of incidents demonstrates failure to take advantage of corrective opportunity).  Nor is there any "concrete reason" to justify the delay; Tavares stated that he did not report the harassment because he felt badly for Whyte.  See Reed v. MBNA Mktg. Sys., Inc., 333 F.3d 27, 35-37 (1st Cir. 2003) (summary judgment vacated because employee inaction based on threats by perpetrator creates fact issue to be resolved by jury).  The effectiveness of Enterprise's Policies is also undisputed in that, as Tavares concedes, as soon as his complaint about Whyte's harassment was communicated to Enterprise's Human Resources department, an immediate investigation was instigated resulting in prompt discipline of Whyte for inappropriate comments and harassment and discrimination training for his coworkers.  After the complaint was communicated to the Human Resources department, Tavares continued as an employee of Enterprise for more than a year, never worked with Whyte again and never again was subjected to sexual harassment.  Moore v. Dartmouth Coll., No. CIV. 99-37-M, 2001 WL 1326584, at *9-10 (D.N.H. Sept. 28, 2001) (stoppage of harassment shows effectiveness of employer's remedial action).  This evidence is more than sufficient to establish that, however Whyte's conduct is classified, employer liability does not lie because Enterprise is protected by Faragher-Ellerth.

Agusty-Reyes v. Dep't of Educ. of P.R., 601 F.3d 45, 55 (1st Cir. 2010) (defense designed to protect responsible employers with effective sexual harassment policies and responsive grievance processes); Lee-Crespo v. Schering-Plough Del Caribe Inc., 354 F.3d 34, 45-46 (1st Cir. 2003) ("Prompt remedial action that eliminates the allegedly intolerable working conditions operates as a complete defense to a claim of constructive discharge.").

A final loose end before closing the book on Tavares's claims about Whyte: Tavares alleges that, in April 2009, almost a year after Whyte showed him a picture of her younger, thinner self, making him uncomfortable, she "demoted" him.  Tavares does not claim that he rebuffed any overture by Whyte in the months preceding the "demotion" so this claim is not one that requires an analysis of whether Whyte engaged in *quid pro quo* sexual harassment or whether the "demotion" was in retaliation for Tavares's negative reaction to her flirtation.  Nor does Tavares present any other evidence suggesting or permitting the inference that the transfer was the result of discriminatory animus.  Rather, the factual evidence that Tavares has presented establishes that Whyte told him she was transferring him to different duties for positive reasons (because he was "young, physical fit, efficient and accountable") and that she transferred him right back to the driver position he preferred as soon as he presented the note from Dr. Ragheb.  I find nothing about this incident that is conceivably actionable.  See Richardson v. Whitmarsh Corp., No. CA 07-309 ML, 2009 WL 5178075, at *16 (D.R.I. Dec. 29, 2009) (mere transfer from the first to the third shift, unaccompanied by a reduction in pay or significantly diminished job responsibilities, does not constitute adverse employment action).

Based on the foregoing, I recommend that this Court enter summary judgment in favor of Enterprise with respect to all claims based on harassment or discrimination by Whyte.

2.      Employer Retaliation for Complaints about Whyte's Harassment

After he returned from the medical leave of absence in January 2011, Tavares claims that he became the victim of retaliation both by Enterprise, acting through his supervisor and its management, and by his coworkers, all based on his protected conduct in complaining about Whyte and in filing the first Charge with RICHR.  I focus now on the claim of retaliation committed by his supervisor and Human Resources,[16] which consists of a performance review critical of his safe driving, a Correction Notice for dangerous and erratic vehicle operation and termination for creating a hazardous condition on the highway involving himself, a coworker and an Enterprise vehicle.

To state a Title VII claim for retaliation, Tavares must prove by a preponderance that he undertook protected conduct, that Enterprise took a material adverse action against him and that there is a causal nexus between its actions and his protected conduct.  Planadeball v. Wyndham Vacation Resorts, Inc., 793 F.3d 169, 175 (1st Cir. 2015).  Tavares claims that his October 2010 complaint about Whyte's harassment and the resulting RICHR Charge, both unquestionably protected conduct, led to criticism by his new supervisor and ultimately to termination.  With the customary assumption that Tavares can make out a *prima facie* case, and with no direct evidence that these adverse employment actions were in retaliation for his complaints about Whyte, the analysis proceeds under the McDonnell Douglas burden-shifting framework.  Galvao v. Gillette Co., 121 F.3d 695, at *3 (1st Cir. 1997).  Under McDonnell Douglas, Enterprise has articulated a non-retaliatory reason for the negative review, the discipline and the termination (its legitimate concerns about safety), placing the ultimate burden of proof on Tavares to prove by a preponderance that the adverse actions were in retaliation for the exercise of protected rights. Colburn v. Parker Hannifin/Nichols Portland Div., 429 F.3d 325, 332 (1st Cir. 2005).

---

[16] The coworker retaliation, which allegedly created a hostile work environment but is factually unrelated to any tangible adverse employment action, is discussed separately in the next section of this report and recommendation.

To sustain his burden of presenting probative evidence to dispute Enterprise's legitimate, nondiscriminatory explanation for its actions, Planadeball, 793 F.3d at 175, Tavares attempts to rely on temporal proximity.  Relatedly, Tavares argues that the reasons given for terminating his employment are pretextual because all of the criticism of him pertaining to safe vehicle operation – his May 26, 2011, review, the June 23, 2011, Correction Notice, and the November 10, 2011, termination – happened after he began to complain.[17]  This argument is unavailing.  First, temporal proximity is lacking: the Whyte complaint was initially made on October 6-7, 2010, and the RICHR Charge issued on May 31, 2011, while the critical review was dated May 26, 2011, the discipline notice was not given until June 23, 2011, and Tavares was not fired until November 10, 2011.  ECF No. 118-4 at 21-22.  Further, Tavares presents no evidence to establish that his supervisor was aware of the meeting with Piccolo in October 2010 or of the RICHR Charge either when he prepared Tavares's review or when he disciplined Tavares for unsafe driving.  See id. at 22.  In any event, evidence of temporal proximity alone is insufficient to establish pretext.  Reilly v. Cox Enters., Inc., No. CV 13-785 S, 2016 WL 843268, at *3 (D.R.I. Mar. 1, 2016) (citing Calero-Cerezo v. U.S. Dep't of Justice, 355 F.3d 6, 26 (1st Cir. 2004)).

Tavares also tries to sustain his McDonnell Douglas burden with the arguments that the discipline notice is a pretext because his admittedly erratic driving did not cause any vehicle damage and that his termination is a pretext because Enterprise should have believed Tavares's version of the incident (that he forced a coworker speeding at over 90 miles per hour to stop) and concluded that he acted appropriately in that it would have been more dangerous to allow the other worker to continue to speed.  Finally, he argues that a fact finder could conclude that

---

[17] The factual foundation for this argument is partially flawed in that the formal Charge did not actually issue until May 31, 2011.  See n.10 supra.

Enterprise's investigations were pretextual because it consistently concluded each by disbelieving the Cape Verdean Muslim (himself) while crediting the Caucasian non-Muslims (other employees).  In analyzing the viability of these arguments, this Court must maintain focus on the ultimate issue: whether, viewing the record as a whole and taking all inferences in his favor, a reasonable jury could find that Enterprise's stated reason for each action was a pretext for unlawful retaliation.  Collazo v. Bristol-Myers Squibb Mfg., Inc., 617 F.3d 39, 50 (1st Cir. 2010); Calero-Cerezo, 355 F.3d at 26.  Viewed through this lens, Tavares's facts are simply insufficient to support an inference of pretext.

Focusing first on supervisor Hall's critical review and the discipline notice, in addition to the lack of proof that Hall knew about the Whyte complaints, Tavares has also failed to present a scintilla of evidence that Hall knew Whyte nor had any reason to avenge Tavares's criticism of her vulgar workplace language, criticism in which other employees joined, as the Piccolo investigation revealed.  Moreover, Tavares has not even attempted to challenge the factual underpinnings for Hall's criticism of his driving in the May 2011 review, except to point out that his prior reviews were favorable.  More importantly, Tavares has effectively admitted that he engaged in the dangerous behavior for which Hall disciplined him in June 2011; his only argument that the discipline notice is a pretext is the illogical contention, unsupported by any facts, that Enterprise normally does not punish dangerous driving unless it results in actual damage.[18]  There is simply no evidence to buttress the proposition that the reasons for Hall's adverse actions were a pretext to cover up his real goal of retaliating for the Whyte complaint. See Arroyo v. Colvin, No. 14-1855, 2016 WL 850952, at *2-4 (1st Cir. Mar. 4, 2016).

---

[18] Tavares's factual predicate for this conclusion is Hall's response that he "cannot recall" to Tavares's question about discipline imposed for "tapping" other vehicles.  This testimony does not support Tavares's interpretation of it.  See n.12 supra.

Tavares's contention that Enterprise's November 2011 decision to terminate him was pretextual is equally unavailing.  The termination decision was properly based on information learned by Piccolo and another Enterprise manager during a prompt and thorough investigation of the incident; nor is there any suggestion that the termination process was a departure from Enterprise's usual procedures.  Kendrick v. Penske Transp. Servs., Inc., 220 F.3d 1220, 1231 (10th Cir. 2000) (no pretext if no evidence that employer's investigation was inadequate or sham); Cook v. CTC Commc'ns Corp., No. CIV.A. 06-CV-58-JD, 2007 WL 3284337, at *8 (D.N.H. Oct. 30, 2007) (evidence of pretext present when chief executive told in-house counsel to investigate plaintiff because he wanted him fired).  There also is no evidence that Piccolo or other managers involved in the decision to terminate ever demonstrated any discriminatory animus towards Tavares; to the contrary, the ample record of Piccolo's dealings with Tavares evince that she acted with patience, with respect and with an attitude of careful attention to each of his many complaints.  See Webber v. Int'l Paper Co., 417 F.3d 229, 236 (1st Cir. 2005) (lack of evidence that decision-maker harbored or demonstrated any discriminatory animus undermines showing of pretext).  Finally, there are simply no facts to support Tavares's claim that Piccolo had a pattern of resolving the issues raised by his complaints not on the merits but rather by automatically disbelieving the only Muslim (himself) while accepting the statements of Caucasian non-Muslims.[19]

---

[19] For example, the record provides no information about the religion of the many individuals interviewed by Piccolo to follow up on Tavares's complaints; therefore, it is impossible to compare her findings regarding the statements from Muslims and those regarding statements from non-Muslims.  As to race, Tavares complains most bitterly about Piccolo's failure to credit his claim that Whyte sexually harassed him; however, the evidence establishes that Whyte is also non-Caucasian.  In any event, and most importantly, review of the record reveals that Piccolo did believe that Tavares was upset about the conduct of which he perceived himself to be the victim. Contrary to Tavares's claim, the undisputed facts establish that, over the course of Tavares's employment, Piccolo accepted many of Tavares's assertions that did not sound delusional and, where appropriate, took action, including the discipline of Whyte and the requirement that harassment and discrimination prevention training be conducted.

Tavares's challenge to the termination decision rests principally on his contention that his version of what happened should have been accepted by Enterprise.  However, it is well settled that the employee cannot show pretext by demonstrating that the employer's foundation for the decision to terminate was incorrect or unwise, as long as the employer believed its stated reason. Id. at 238 (employer may terminate employee for nondiscriminatory reason even if decision seems unwise); Goldman, 985 F.2d at 1118 (in assessing pretext, court must assess whether employer believed its stated reason); Morgan v. Mass. Gen. Hosp., 901 F.2d 186, 191 (1st Cir. 1990) (plaintiff fired for starting fight could not prevail by questioning accuracy of employer's belief).  The court may not act "as super personnel departments, assessing the merits – or even the rationality – of employers' nondiscriminatory business decisions." Fennell v. First Step Designs, Ltd., 83 F.3d 526, 537 (1st Cir. 1996).  Here, it is undisputed that Piccolo conducted interviews and relied on information obtained from two coworkers, corroborated by the Massachusetts State Police officer and Tavares's inconsistent statements, before making the finding that Tavares's conduct was inappropriate, created a safety risk and warranted termination.  Whether her factual conclusion was right or wrong, this unrebutted evidence is more than sufficient to establish that Tavares has not sustained his burden of showing that Enterprise's reason to terminate was pretextual.[20]  See Reilly, 2016 WL 843268, at *4 (when

---

[20] Gilding the lily is the undisputed evidence that Enterprise's decision to terminate did not arise in a vacuum of an unblemished record; the prior discipline notice warned Tavares that any recurrence of unsafe behavior in handling vehicles would result in termination.  See Colon v. United States, No. CIV. 05-1478(GAG), 2006 WL 2345955, at *4 (D.P.R. Aug. 10, 2006) (summary judgment appropriate when no evidence that prior warnings were pretextual). Also pertinent is that it was Piccolo to whom Tavares addressed his complaint about Whyte; she initiated an extensive investigation, credited the allegation that Whyte's workplace behavior was unacceptable and disciplined Whyte.  It belies common sense to conclude that the same individual who credited Tavares's factual complaint and disciplined Whyte would terminate Tavares for his role in bringing Whyte's misconduct to her attention.  See Barboza v. Town of Tiverton, C.A. No. 07-339-ML, 2010 WL 2231995, at *9 (D.R.I. June 2, 2010) (illogical that sexual harassment complaint was real cause of decision to terminate when termination decision-maker was also initiator of sexual harassment investigation).

employer interviews corroborated allegations of misconduct, despite plaintiff's denial that she did "yell," reason for termination not pretextual; summary judgment granted).

Cumulatively, the death knell of Tavares's claim of retaliatory criticism, discipline and firing is sounded by the complete dearth of any competent facts to establish that Enterprise's decisions to criticize, discipline and then terminate Tavares for conduct that endangered people and property were pretextual, coupled with the absence of any foundation for an inference of a nexus between the adverse decisions and Tavares's complaints about Whyte.  Murray, 2016 WL 1622833, at *7 (record bereft of evidence of connection between protected activity and firing; summary judgment on retaliation claim granted).  Accordingly, I find that Enterprise is entitled to summary judgment on Tavares's claim that his critique, discipline and termination were retaliatory and recommend that this Court grant that aspect of its motion.

   3.   Retaliation/Hostile Work Environment Caused by Coworkers

Tavares claims that his return from medical leave opened the flood-gates of retaliatory actions against him by his coworkers; while he appears to allege that the motivating animus for all of them was his sexual harassment complaint about Whyte, the claims themselves appear to be based on religious, racial, national origin and disability discrimination that effectively created a hostile work environment.  I analyze them from every perspective.

When the hostile work environment is created by a coworker, rather than a supervisor, the employer can only be liable if "the employer knew or should have known about the harassment, yet failed to take prompt action to stop it."  Noviello v. City of Boston, 398 F.3d 76, 95 (1st Cir. 2005); Danco, Inc. v. Wal-Mart Stores, Inc., 178 F.3d 8, 16 (1st Cir. 1999).  In addition, if the employer takes prompt and reasonable action to address the harassment, it cannot be found liable; an "employer who has taken reasonable steps under the circumstances to correct

and/or prevent racial harassment by its nonsupervisory personnel has not violated Title VII."
DeGrace v. Rumsfeld, 614 F.2d 796, 805 (1st Cir. 1980); see Moore, 2001 WL 1326584, at *9-
10 ("[o]nce an employer has in good faith taken those measures which are both feasible and
reasonable under the circumstances to combat the offensive conduct we do not think he can be
charged with discriminating on the basis of race") (quoting DeGrace, 614 F.2d at 805); see also
Espinal v. Nat'l Grid NE Holdings 2, LLC, 794 F. Supp. 2d 285, 294 (D. Mass. 2011) (in
coworker cases, "an employer can only be liable if the harassment is causally connected to some
negligence on the employer's part").

       Here, the record undisputedly establishes that every complaint about his coworkers'
behavior that Tavares brought to Piccolo resulted in her prompt response with an investigation
whether anything inappropriate had occurred and with corrective action if she concluded that it
had.  She arranged at least two meetings with Tavares to discuss his concerns and reminded him
of his right to work in "an environment free from intimidation and harassment of any sort."  ECF
No. 126-6 at 4.  When he told her he was thinking of quitting, she urged him not to, reminding
him that she was continuing to work on reviewing the incidents he raised.  Id. at 5.  When
Tavares wrongly believed that he was being asked to do something for a retaliatory reason, such
as when he was asked to fill in the form to update the company's emergency plan, she explained
what the form was and why he should fill it out; similarly, when he became suspicious about
being asked to do a survey, she assured him that he was not required to complete it.  Id. at 8, 16.
While Tavares disputes the results of her many investigations, that is not the test for imposing
liability.  Rather, the employer can be held liable under Title VII for coworker harassment only if
its responses indicate an attitude of permissiveness that amounts to discrimination in that it failed
to act reasonably under the circumstances.  Moore, 2001 WL 1326584, at *9-10.  Here, Tavares

presents no concrete reasons to doubt the sincerity of Piccolo's conclusions about each of the incidents she investigated.[21]  See Hepburn v. Brown Univ., C.A. No. 14-368 S, 2016 WL 1384818, at *2-4 (D.R.I. Apr. 7, 2016) (with no reason to doubt sincerity of conclusion of investigation involving interviews of employees telling different version from version told by black male who was fired, summary judgment granted).

Although Enterprise was not able to rid the workplace of comments and incidents that Tavares perceived as harassment, the undisputed facts establish that it responded promptly and in a manner reasonably calculated to address each of his specific complaints and designed to prevent any systemic harassment.  See DeGrace, 614 F.2d at 805 (imposing on employers the obligation to take "reasonable steps under the circumstances to correct and/or prevent racial harassment"); Rutledge v. Macy's E., Inc., No. 01-12-P-H, 2001 WL 1117108, at *9 (D. Me. Sept. 17, 2001) (to avoid liability, employer need not prove success in preventing harassing behavior, just that it exercised reasonable care).  Accordingly, I recommend that this Court enter summary judgment in favor of Enterprise on the claims of harassment and retaliation by coworkers.

4.      Refusal To Accommodate Religious Practice

Tavares complains that Hall, his supervisor, gave him a hoodie or a ball cap with an Enterprise logo and urged him to wear it in lieu of the kufi that Tavares alleges is his religious practice.  This fails as a Title VII claim because Tavares's version of the incident makes clear that Hall was making a mere suggestion, which Tavares did not accept in that he continued to wear the kufi every day that he worked at Enterprise.  ECF No. 118-4 at 13-14.  While Title VII requires that an employee's religious practice must be reasonably accommodated as long as that

---

[21] Tavares's conclusory accusation that Piccolo consistently credited the non-Muslim Caucasian's statements over his version of events lacks any factual support.  See n.19, supra.

is possible without undue hardship on the conduct of the employer's business, 42 U.S.C. §

2000e(j), Tavares presents nothing permitting the inference that Enterprise somehow missed the

mark.  Enterprise allowed his religious practice and imposed no requirements to deter or prevent

it.  Hall's rejected suggestion that Tavares try wearing a different hat does not amount to

discrimination based on religion.  Rivera v. P.R. Aqueduct & Sewers Auth., 331 F.3d 183, 189

(1st Cir. 2003) (to be discriminatory, remarks must be more than merely tinged with content

abhorrent to religion); cf. Murray, 2016 WL 1622833, at *6 (stray "snide comments" without

more are "minor instances of employment skirmishes" that do not move the meter).  Because

Tavares fails to present facts sufficient for a *prima facie* case in that the undisputed evidence

establishes that his religious practice was accommodated, Sanchez-Rodriguez v. AT & T

Mobility P.R., Inc., 673 F.3d 1, 12 (1st Cir. 2012), I recommend that the Court grant summary

judgment on this claim.

       5.     Failure to Accommodate Disability

Enterprise does not dispute that Tavares suffers from a serious mental disability or that he

sought reasonable accommodation both in limiting the number of hours to be worked per week,

and in retaining him in the driver's position instead of placing him in a position whose duties

would "overtax[] his fragile cognitive and emotional system."  ECF No. 4-1 at 27.  And Tavares

does not dispute that he received the requested accommodations once he provided medical

documentation.  Tavares's only ADA claim appears to be based on his perception that the

requests by Whyte and Piccolo for two letters from his physician documenting his need for an

accommodation were unreasonable.  He seems to inject this claim with an element of Title VII

discrimination in that he alleges, with no factual foundation, that no non-Muslim with a similar

disability was asked to submit two letters.

Failing reasonably to accommodate a disabled person is a form of disability

discrimination.  Lang, 813 F.3d at 454.  However, the burden of demonstrating the need for an

accommodation rests on the employee and it is specifically contemplated that the employer may,

indeed should, require appropriate documentation from a qualified medical provider so that the

requested limitations are clear.  See Murray, 2016 WL 1622833, at *4 (when need for

accommodation not obvious, employer may require that employee with disability provide

documentation of need for accommodation); Stewart v. St. Elizabeths Hosp., 589 F.3d 1305,

1309 (D.C. Cir. 2010) (failure to accommodate not actionable where employee failed to provide

medical documentation that it was safe to return to work).  As the EEOC regulations confirm, an

employer can ask an employee for documentation when he requests a reasonable accommodation

as long as the request is job-related and consistent with business necessity.  Equal Emp.

Opportunity Comm'n, Enforcement Guidance: Disability-Related Inquiries and Medical

Examinations of Employees Under The Americans with Disabilities Act (ADA), 2000 WL

33407181, at *9 (July 27, 2000); see 42 U.S.C. § 12112(d)(4)(A) (inquiries into disability

appropriate when "job-related and consistent with business necessity"); Gajda v. Manhattan &

Bronx Surface Transit Operating Auth., No. 03 CIV. 1642 (JSR), 2003 WL 22939123, at *2

(S.D.N.Y. Dec. 12, 2003) (employer "requests for medical information were consistent with

business necessity").

Here the undisputed evidence establishes that both of Enterprise's requests for a doctor's

note were made for job-related reasons and were consistent with business necessity.  While there

is plainly a factual dispute as to what was discussed at Tavares's hiring regarding his need for

accommodation, as soon as he advised Whyte that he needed to work part-time to accommodate

his disability, she properly asked for medical documentation and, when it was received,

Enterprise fully accommodated his request.  Notably, Tavares does not complain about the next

doctor's note, which he supplied *sua sponte* to get himself transferred from the "car prep"

position that he did not like back to the position of driver.  Nor did he complain about providing

the third and fourth doctor's notes, which formed the basis for his taking and returning from

medical leave.  And the last, about which he does complain, was reasonably requested by Piccolo

because Tavares wanted to work more hours than his physician had previously recommended.

See Templeton v. Neodata Servs., Inc., 162 F.3d 617, 618-19 (10th Cir. 1998) (request for

updated medical information was reasonable in light of treating physician's letter indicating

doubt as to employee's ability to return to work as scheduled).

I find nothing actionable in Enterprise's request for two doctor's letters and recommend

that the Court enter summary judgment in its favor on this claim.

### 6.   Discrimination in Hiring

Tavares claims that the fact that his April 2008 job application reflected that he had not

earned a four-year college degree, while it is undisputed that he had, is evidence that Enterprise

would have hired him as a management trainee, but failed to do so because of discriminatory

animus.  This claim – wrongful denial of a management trainee position – was raised for the first

time after this case had been pending and Tavares received a copy of the job application in

discovery.  It does not appear in either of the Charges of Discrimination that Tavares filed with

RICHR.  ECF No. 131-4.  Nor is it mentioned in the Complaint.  ECF No. 4.

A bedrock principle of employment law is that causes of action based on claims not

brought before the Equal Employment Opportunity Commission or RICHR are barred for failure

to exhaust administrative remedies.  Martinez-Rivera v. Puerto Rico, 812 F.3d 69, 77 (1st Cir.

2016); Thornton v. United Parcel Serv., Inc., 587 F.3d 27, 31 (1st Cir. 2009).  It is also well

settled that the filing of a charge asserting other, only tangentially related, claims is not a reason

to sidestep the exhaustion requirement; while "[a]n employee may bring to a court a claim of

retaliation under Title VII without first presenting that claim to the agency if the retaliation is

reasonably related to and grew out of the alleged discrimination that the employee did report," an

unlawful employment practice that preceded the filing of the charge must be included in it or be

barred for the failure to exhaust.  Sellers v. U.S. Dep't of Def., No. C.A. 07-418S, 2009 WL

559795, at *13 (D.R.I. Mar. 4, 2009) (quoting Mosely v. Potter, Docket No. 07–96–P–S, 2008

WL 877787, at *7 (D. Me. Mar. 27, 2008)).  As this Court held in Russell v. Enterprise Rent-A-

Car Company of Rhode Island, 160 F. Supp. 2d 239 (D.R.I. 2001), "[t]o allow plaintiff to litigate

a claim only tangentially related to those in her administrative charge would thwart the EEOC's

ability and authority to facilitate the investigation and resolution of Title VII disputes."  Id. at

258.  Here, there is nothing in the "language used by [Tavares]" in setting out the factual basis

for either of the Charges that comes close to suggesting discrimination in hiring.  Id. at 257-58.

I find that Tavares should be barred from pursuing the claim that he was wrongfully

denied a management trainee position based on his failure to comply with the applicable

exhaustion requirements.[22]  Accordingly, I recommend that summary judgment on this claim,

operating without prejudice, enter for Enterprise.  Franceschi v. U.S. Dep't of Veterans Affairs,

514 F.3d 81, 86 (1st Cir. 2008) (summary judgment without prejudice when based on failure to

exhaust).

## II.    MOTION FOR SANCTIONS

Enterprise's motion for sanctions is brought pursuant to Fed. R. Civ. P. 26 and 37.  There

is no need to consider it if this case ends based on Enterprise's motion for summary judgment; if

---

[22] It must be noted that, if not barred because of the failure to exhaust, this claim also would founder on the complete absence of any facts to support it.

my summary judgment recommendation is adopted, I also recommend that the sanctions motion be denied as moot.  However, to the extent that any issues remain for trial, the sanctions motion must be determined.  The analysis that follows is focused on the two discrete issues that it raises, one very serious and the other less so.  It is important to note that this sanctions decision is not being written on a clean slate – this Court has already imposed sanctions on Tavares for conduct that included false statements under oath and misrepresentations in court filings.  Tavares v. Enter. Rent-A-Car Co., C.A. No. 13-521S, 2015 U.S. Dist. LEXIS 122401, at *2-4, 30-31 (D.R.I. Jan. 16, 2015).  Because of his *pro se* status and the complications of his mental illness, the Court was lenient during the first round of sanctions and did not dismiss the matter; however, the lesser sanctions were imposed with a strong caution that similar conduct in the future could result in the sanction of dismissal.  Id. at *39-40.

## A.       Late Production of Relevant Documents

The less serious issue is Tavares's production of certain documents called for by discovery propounded well in advance, but not produced until after his deposition was completed on August 20, 2014.  Enterprise contends that some of the new documents were supplied in September 2014 in a supplemental document production, while others were not produced until Tavares questioned Enterprise deposition witnesses about them during various depositions held in October 2015.  The remedy that Enterprise seeks is limited – it requests only that the Court permit it to reopen Tavares's deposition and inquire about the newly produced documents.  In response, Tavares argues that, as a *pro se* litigant, he mistakenly believed that documents supplied to RICHR did not need to be produced because they were in Enterprise's possession as a party to that proceeding.  As this litigation has proceeded, he has come to understand that he

had to produce such documents; he did so (in part) in making the September 2014 supplemental production.

This aspect of the motion for sanctions is easily solved.  If this case proceeds to trial, I recommend that the Court impose the curative sanction of ordering that Tavares, at his option, may either submit to being deposed regarding the untimely produced documents or forego their use at trial.  If he opts to be deposed, the supplemental deposition shall be limited to two hours, during which Enterprise may examine him only regarding those late-produced documents that Tavares opts to have available for use at trial.  Le v. Diligence, Inc., 312 F.R.D. 245 (D. Mass. 2015) (renewed deposition necessitated by production of documents after first deposition).  Morrison v. Stephenson, No. 2:06-CV-0283, 2008 WL 145017, at *2 (S.D. Ohio Jan. 10, 2008) ("if, after a witness is deposed . . . new documents are produced, the witness may be re-deposed with respect to these new developments").  To the extent that Enterprise's motion for sanctions seeks any other remedy with respect to the late produced documents, I recommend that it be denied.  See Official Comm. of Unsecured Creditors of Exeter Holdings, Ltd. v. Haltman, No. CV135475JSAKT, 2016 WL 1180194, at *4 (E.D.N.Y. Mar. 25, 2016) (in general, re-opening depositions "limited to particular documents"); Kotas v. Eastman Kodak Co., No. CIV.A. 95-CV-1634, 1997 WL 570907, at *17 (E.D. Pa. Sept. 4, 1997) (renewed depositions "limited to the area of these newly-produced corporate documents"); cf. Joachim v. Straight Line Prods., LLC, No. 2013-149-APPEAL, 2016 WL 2609557, at *1-6 (R.I. May 6, 2016) (when document produced for first time at trial on re-direct examination, sanction of dismissal is appropriate).

### B.     Use of Fraudulently Altered Document

The other aspect of the sanctions motion is very serious indeed.  Enterprise contends that the document that Tavares marked as Piccolo Exhibit 18 (ECF No. 126-10) is a forgery.

The background to this troubling claim may briefly be stated.  In October 2010, Tavares had a series of meetings with Enterprise's Human Resources Manager Kristen Piccolo during which he complained about the conduct of his supervisor Whyte and about the conduct of various coworkers.  Tavares's description of the specific facts he laid before Piccolo during these meetings is foundational both to his claim of a hostile work environment preceding the meetings and of retaliatory adverse employment actions (culminating in termination) after the meetings.  The accused forgery purports to be a written factual statement laying out his complaints that he claims he gave to Piccolo on October 7, 2010 – Tavares has sworn under oath that Piccolo signed the document in his presence that day to acknowledge that she had received it.  ECF No. 125-2 at 4-5.  She adamantly denies that she ever saw it until he marked it as an exhibit and handed it to her at her deposition.  ECF No. 119-9 at 6-7.  Enterprise denies that it was produced by either party until the Piccolo deposition when Tavares marked it; it also argues that it is illogical that Piccolo would have worked so hard to finalize the statement (ECF No. 126-5) that she agrees she did sign on October 7, 2010, if the other statement (ECF No. 126-10) had already been prepared and presented to her by Tavares.

If Tavares's version of these events is false, it amounts to a falsehood that directly impacts core allegations of the complaint, justifying the imposition of the sanction of dismissal. Aoude v. Mobil Oil Corp., 892 F.2d 1115, 1118-19 (1st Cir. 1989) (sanction of dismissal appropriate when misconduct directly impacts the core allegations of the complaint).  When a plaintiff both perjures himself and forges a document critical to the prosecution of the case, the conduct so impugns the integrity of the court that there is no need to consider sanctions lesser than dismissal.  Jackson v. Murphy, 468 F. App'x 616, 620 (7th Cir. 2012); see Combs v. Rockwell Int'l Corp., 927 F.2d 486, 488-89 (9th Cir. 1991) (alteration of deposition testimony on

key aspect of case warrants dismissal).  Courts specifically find that dismissal is appropriate in employment cases when the manufactured evidence and perjured testimony goes to the heart of the discrimination claim.  Pope v. Fed. Express Corp., 974 F.2d 982, 983-84 (8th Cir. 1992).

What follows is detailed exposition of the facts relevant to this component of the sanctions motion, beginning with the facts that are undisputed.  These facts focus on the many (five in all) versions of written statements by Tavares describing the harassment and discrimination that he believes was inflicted by Whyte.  Because the content and provenance of the first four statements (whose authenticity is not in issue) intertwine with the content and provenance of the statement challenged as a forgery, with apologies to the reader, the description of each is somewhat granular.

As Human Resources Manager, Piccolo investigated employee complaints and prepared statements to record what she learned.  Consistent with this practice, as Piccolo testified, on October 6, 2010, she met with Tavares at his request "to discuss complaints."  ECF No. 118-3 at 5.  After that meeting, she took the time to prepare a typewritten six-page draft statement based on her notes of what Tavares had told her.  ECF No. 126-5 ("Statement I").  On October 7, 2010, she met again with Tavares to go over this draft statement.  ECF No. 118-3 at 5.  During the October 7 meeting, Tavares declined to sign the foot of Statement I; however, at Piccolo's request, she and Tavares both signed and dated the top of every page.  Id. at 7.  On October 7 and again on October 13, 2010, Piccolo worked with Tavares as he continued to make handwritten edits to Statement I.  Despite the additional time invested, Tavares refused to agree to acknowledge that Statement I was complete by signing at its foot.  Id. at 6-7; ECF No. 126-5 at 6-7.  Tavares's averment that Statement I is a true copy of his written complaint "in verbal and in writing to Piccolo about the sexual harassment" is not disputed by Enterprise.  ECF No. 126-1 at

5, ¶ 24.  Meanwhile, on October 7, 2010, Piccolo commenced her investigation of the complaints in Statement I by interviewing and taking statements from other employees.

Chronologically, the next two undisputedly authentic versions of Tavares's complaint about Whyte appear in statements that he supplied five months later to RICHR in connection with the initiation of the filing of the Charge of Discrimination.  First, a typed statement headed "Rogerio Tavares Statement 3/7/11," with an RICHR date-stamp indicating that it was received on March 8, 2011, is attached to Tavares's affirmation; Tavares describes it as a copy of his "complaint [filed] with Rhode Island Human Right Commission"; Enterprise does not challenge the authenticity of this statement.  ECF No. 126-1 at 7; ECF No. 126-7 ("Statement II").  Neither party suggests that Statement II was given to Piccolo.  Second, also date-stamped as received by RICHR on March 8, 2011, is a typed document headed, "Rogerio Tavares statment," with the subheading, "Oct 6, 2010 8am Rogerio Tavares speaking with HR Manager Kristen Piccolo Informal Resolution."  ECF No. 117-11 ("Statement III").  Enterprise attached Statement III to its summary judgment motion describing it as the statement that Tavares submitted to the Commission; Tavares does not dispute that contention.  ECF No. 117-1 at 13.  There is no suggestion that Piccolo was given Statement III.

The fourth statement first appears in the record as an attachment to Tavares's "Amended Complaint/Corrected," ECF No. 13, which he filed on December 10, 2013, in a failed attempt to amend.  ECF No. 13-1 ("Statement IV").  The purported pleading describes the attachment: "[a]ttached additional documents for informal resolution speaking with (details of complaint) Kristen Piccolo HR Manager with Enterprise Holding on October 6, 2010."  ECF No. 13 at 5, ¶ 4.  Statement IV is headed "Roger Tavares v. Enterprise Rent a Car," with a subheading that states, "Oct 6, 2010 8am Roger Tavares speaking with HR Manager Kristen Piccolo Informal

Resolution." ECF No. 13-1 at 1. Statement IV is verbatim identical to Statement III, which was submitted to RICHR on March 8, 2011, except that the latter is in the first person while the former has been edited to speak in the third person. In addition, the titles are different, with the March 2011 Statement III entitled "Rogerio Tavares statment" and the December 2013 Statement IV entitled "Roger Tavares v. Enterprise Rent a Car." Compare ECF No. 117-11, with ECF No. 13-1 at 1. Tavares does not explain how or why Statement IV came to be copied from Statement III; the parties do not dispute the provenance of Statement IV. There is no suggestion that Enterprise became aware of Statement IV until it was filed in December 2013 when Tavares tried to amend his complaint.

The accused statement ("Statement V") is identical to Statement IV, with a material distinction: at the top of the first page appears a copy of the signatures of Tavares and Piccolo and of the handwritten date, October 7, 2010, while at the bottom of the first page is a handwritten note stating "facts that were missing." ECF No. 126-10. In his affirmation in support of his opposition to the motion for summary judgment, Tavares both affirms Piccolo's testimony that Statement I is the version that he and she worked on for several days during October 2010, but also swears that the accused statement, Statement V, is a "[c]opy of the statement dated Oct. 6, 2010 given to Piccolo." ECF No. 126-1 at 7, ¶ 35. In his affirmation in support of his opposition to the motion for sanctions, Tavares is more specific: he avers that the accused statement is a copy of Statement IV (the version filed in December 2013) and that Piccolo's signature and the date (October 7, 2010) were placed on the document by Piccolo at a meeting with Tavares on that day to go "over additional facts about which I was complaining . . . I was presenting the document to Piccolo to make clear that these were additional complaints that I wanted her to consider in her investigation." ECF No. 125-2 at 4-5, ¶ 8. He swears that

Piccolo "signed her name at the top and dated it to show when she first saw the document"; he explains his possession of only a copy of Statement V with his sworn averment that Enterprise has the original of this document and produced it in response to Tavares's discovery requests.[23] ECF No. 125-2 at 5, ¶ 9.

Piccolo's deposition tells an entirely different story: she testified that she had never seen Statement V until it was handed to her at her deposition on October 5, 2015. ECF No. 119-9 at 6. While agreeing that the copy of her signature on the top of the first page appears to be her handwriting, id. at 7, she adamantly denied that she signed Statement V. Id. Piccolo testified that, when she uses the convention of asking an employee to sign the top of the page to confirm that the page was discussed, her practice is to have both herself and the employee sign every page; Statement I reflects this protocol, while Statement V does not in that the copies of the signatures appear only on the first page. See id. at 6. Consistent with Piccolo's testimony and contrary to Tavares's averments, the two signatures (those of Tavares and Piccolo) and the date appearing at the top of the first page of Statement V appear to the casual observer to be photographically exact copies of the signatures and date appearing on the top of the fourth page of Statement I. Compare ECF No. 126-5 at 5 (page four of Statement I), with ECF No. 126-10 at 2 (page one of Statement V).

When these facts are examined in light of the totality of the evidence, they permit the inference that Statement V is a forgery. It makes little sense that Piccolo and Tavares would have worked so hard over three meetings to try to complete Statement I if that effort was obviated by Tavares's presentation to Piccolo of Statement V. Similarly, the title of Statement V

---

[23] Enterprise adamantly denies that it has the original of Statement V or that it produced Statement V in discovery; in addition, it proffers a copy of Tavares's entire production to establish that he did not produce it either.  See ECF No. 118-3 at 7 (counsel objects to Statement V at Piccolo deposition because it had never been produced in discovery and counsel has never seen it before).  Beyond his sworn statement, Tavares has not presented anything to establish that Statement V was produced by Enterprise or was produced by him before the Piccolo deposition.

– "Roger Tavares v. Enterprise Rent a Car" – makes little sense in the context of the October 2010 meetings when Tavares was making his first complaint about Whyte and did not yet know how Enterprise would respond; put differently, in October 2010, no adverse proceeding between Tavares and Enterprise existed.  It also makes no sense that Piccolo would lie about Statement V; the undisputed evidence establishes that she was trying to hear and understand the full scope of Tavares's complaints so that she could commence a meaningful investigation and it is illogical for her to lie to suppress the existence of Statement V if she really saw it.  It is far more likely that Statement V was created from Statement IV, which was attached to the December 2013 Amended Complaint.  The troubling identicality of the signatures on Statement V's first page to those that appear on page four of Statement I permits the inference that Statement IV was fraudulently altered by cutting out a copy of those signatures from Statement I and taping or pasting them onto the first page of Statement IV, which was copied to create Statement V.  This inference is corroborated by Piccolo's testimony that, if she uses the protocol of signing the top of a statement, then all pages are signed, not just the first page, as well as by her adamant denial that she signed Statement V.

All of these inferences are more than enough to launch this sanctions issue to an evidentiary hearing at which the Court can evaluate the credibility of the individuals involved, particularly Tavares and Piccolo, and consider whether the evidence supporting such troubling findings clears the bar by the clear and convincing standard that must be applied before imposing a case-ending sanction.  Secrease v. W. & S. Life Ins. Co., No. 1:15-CV-00742-SEB, 2015 WL 7096295, at *2 (S.D. Ind. Nov. 12, 2015) (fraud on the court by alteration of document determined at evidentiary hearing); Paniagua v. Max 18, Inc., No. 11 C 03320, 2013 WL 5907893, at *1 (N.D. Ill. Nov. 4, 2013) (court conducts evidentiary hearing on sanctions to

determine if signature forged); Zimmerman v. Poly Prep Country Day Sch., No. 09 CV 4586 FB, 2012 WL 2049493, at *34 (E.D.N.Y. June 6, 2012) (court has inherent authority to conduct evidentiary hearing to determine if it has been the victim of fraud, citing cases).

Based on the foregoing, to the extent that the sanctions motion is not mooted by my recommendation on summary judgment, I recommend that that this Court direct that an evidentiary hearing be conducted regarding whether Statement V is a forgery.  Further, because testimony by Tavares at such a hearing implicates his rights pursuant to the Fifth Amendment,[24] I recommend that, if such a hearing is needed, the Court appoint a special purpose *pro bono* attorney from the Court's *Pro Bono* Panel (or engaged counsel if he is not financially eligible[25] for *pro bono* counsel) for the limited purpose of advising Tavares regarding his right to remain silent and the consequences arising from the invocation of the Fifth Amendment by a plaintiff in a civil case.

## III.    CONCLUSION

Based on the foregoing, I recommend that Enterprise's motion for summary judgment (ECF No. 117) be granted.  I further recommend that its motion for sanctions (ECF No. 119) be denied as moot.  To the extent this Court does not adopt my recommendation on the motion for summary judgment, I recommend that the motion for sanctions be granted in part as follows: that Tavares, at his option, may either submit to being deposed regarding the untimely produced documents or forego their use at trial, that an evidentiary hearing be conducted to determine

---

[24] The first sanctions motion concluded with the finding that Tavares's lies did not amount to perjury pursuant to 18 U.S.C. § 1621.  This time, the subject matter of the testimony that would be required at an evidentiary hearing appears to be "material" to these proceeding, raising the risk of the crime of perjury.  United States v. Diaz, 670 F.3d 332, 351 (1st Cir. 2012).

[25] Despite the caption of his Complaint, which invokes 28 U.S.C. § 1915(e)(2) (permitting civil litigant to proceed *in forma pauperis*), Tavares's *in forma pauperis* ("IFP") application was denied without prejudice to refiling supported by more detailed financial information.  ECF No. 3.  It was never refiled so his eligibility for IFP status, and therefore for *pro bono* counsel, has never been determined.  See Tavares v. Enter. Rent-A-Car Co., C.A. No. 13-521S, 2015 U.S. Dist. LEXIS 122401, at *7-8 n.4 (D.R.I. Jan. 16, 2015)

whether this case must be dismissed as a sanction for the alteration of a material document and that a special purpose attorney (either *pro bono* or engaged) be appointed to represent Tavares at that hearing in light of the risk of perjury posed by such a hearing.

Any objection to this report and recommendation must be specific and must be served and filed with the Clerk of the Court within fourteen (14) days after its service on the objecting party.  See Fed. R. Civ. P. 72(b)(2); DRI LR Cv 72(d).  Failure to file specific objections in a timely manner constitutes waiver of the right to review by the district judge and the right to appeal the Court's decision.  See United States v. Lugo Guerrero, 524 F.3d 5, 14 (1st Cir. 2008); Park Motor Mart, Inc. v. Ford Motor Co., 616 F.2d 603, 605 (1st Cir. 1980).


/s/ Patricia A. Sullivan
PATRICIA A. SULLIVAN
United States Magistrate Judge
June 16, 2016